# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>JLM COUTURE, INC.,<br><br>        Debtor. | Chapter 11<br>(Subchapter V)<br><br>Case No. _____ |

**DECLARATION OF JOSEPH L. MURPHY IN SUPPORT OF FIRST-DAY MOTIONS**

I, Joseph L. Murphy, declare, pursuant to section 1746 of title 28 of the United States Code, that:

**PERSONAL BACKGROUND**

1. I am the president and CEO of New York-based JLM Couture, Inc. (the "Debtor"), the above-captioned debtor and debtor in possession, which I co-founded in 1988. In 1994-1995, I became an employee and CEO of the company. With the company on the verge of insolvency, I stabilized its financial condition raising new equity and arranging for new lines of credit. This led to several years of growth and stability for the company during which period of time there was minimal or no bank debt and substantial permanent equity.

2. As president and chief executive officer, I manage the operations of the Debtor and I am familiar with its day-to-day operations, business, financial affairs and history.

3. I received a BA from UCLA, where as an undergraduate, I received credits in accounting and management courses from UCLA's Graduate School of Management, now known as the "Anderson" school.

4. In the years to follow, after being named CEO, I became the controlling shareholder of the Debtor in 1994, and shortly thereafter began to implement a strategy to dramatically expand and improve the brands offered by the company. My earlier experience raising capital for micro-

cap companies placed me in a unique position to recruit and assemble the talent and financing for my own venture, which ultimately became the Debtor.

5. One novel approach that I as CEO and my team undertook was to establish individual designers under one umbrella sharing operational and fixed costs while differentiating the designers as unique talents and personalities in the marketplace. This included building design support staff, sales and marketing departments, and negotiating for prominent exposure in wedding gown magazines and other media for relevant JLM Couture designers.

6. In my role as president and CEO of Debtor, I oversee all operational aspects of the business including organization, human resources, marketing, sales, operations, finance, administration, oversight and the prosecution of this chapter 11 case. In my capacity as president and CEO, I have general knowledge of the books and records of the Debtor, and am familiar with the Debtor's financial and operational affairs. I believe the business experience, skills and knowledge I have gained while running the Debtor since its beginning gives me particular insights into the Debtor's operations and goals during this process.

7. I submit this declaration in support of the Debtor's petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the motions and applications related thereto (the "First Day Motions"). I believe that the relief sought in the First Day Motions is necessary to enable the Debtor to operate in chapter 11 with minimum disruption to its operations and to successfully reorganize.

8. Except as otherwise indicated, all of the facts set forth in this Declaration are based upon my personal knowledge and recollection, upon information learned from my review of the relevant documents, or opinion based upon my experience and knowledge of the Debtor's

operations and financial condition and my experience in the garment industry generally. If called as a witness, I could and would testify to the facts set forth in this Declaration.

## THE DEBTOR'S BUSINESS

9. The Debtor is a leader in the bridal design and manufacturing industry, operating as a multi-label bridal house engaged in the design, manufacture, and distribution of bridal gowns and bridesmaids dresses. The Debtor houses award-winning brands which include Allison Webb, Ti Adora by Allison Webb, Lazaro, Tara Keely by Lazaro, Lazaro Bridesmaids & Formal, Hayley Paige, Blush by Hayley Paige, La Petite Hayley Paige, and Hayley Paige Occasions.

10. The Debtor is generally regarded as the innovator of the multi-label bridal house and the designers that it has assembled and nurtured have won ten (10) Distinctive Excellence in the Bridal Industry awards for design distinction (couture category), and four British Bridal Buyer awards. In 2005, I was the first recipient of French-owned Wedding Dresses Magazine's lifetime achievement award.

11. The Debtor currently operates nine (9) collections, six (6) of which are bridal lines, two (2) bridesmaid lines and one (1) flower girl line. The Debtor's fashion brands cover a broad spectrum of aspirational to luxury price points. In Spring 2012, the Debtor expanded its presence at the luxury end of the bridal business with the introduction of the Hayley Paige brand and the opening of its flagship store on Robertson Boulevard in West Hollywood, California. The Debtor launched the Allison Webb brand in Spring 2018.

12. The debtor primarily drives revenue by selling bridal gowns through authorized retailers, but since November of 2022 has started selling excess inventory via Shopify directly to consumers.

13. The Debtor currently employs 21 people, which is a reduction from approximately 70 employees in calendar year 2020. None of the Debtor's employees are currently represented by labor unions or covered by a collective bargaining agreement. These employees include designers, sales and marketing specialists, HR, and operations. The Debtor does not manufacture its gowns and dresses in house, instead contracting domestically and abroad to actually create the pieces.

## EXISTING CAPITAL STRUCTURE

14. Prior to the Petition Date, the Debtor obtained that certain small business loan with the United States Small Business Association (the "SBA") dated as of July 23, 2020 (the "SBA Note") with an approximate balance of $150,000 as of the Petition Date. The SBA Note is secured by liens on substantially all assets of the Debtor (collectively, the "Property"). To the extent the Debtor sells merchandise, the Debtor receives income from proceeds of each sale. The Debtor does have cash in its bank accounts from sales prior to the Petition Date, as well as cash from loan proceeds. As of the Petition Date, the Debtor has approximately $151,000 in cash on hand, located in various bank accounts. The Debtor intends to use portions of this cash, to pay operating expenses of its business and expenses related to the administration of this chapter 11 case.

15. The Debtor does not have any other secured or unsecured loans.

16. The Debtor is indebted to certain of its vendors as will be more fully described in the Debtor's Schedules of Assets and Liabilities.

17. The Debtor's landlord has asserted that the Debtor owes approximately $840,072.37 to such landlord pursuant to the expiration of the Debtor's lease agreement and the Debtor's holding over. The Debtor disputes this purported amount. Pre-petition, the Debtor's

landlord initiated an action in the Civil Court of the City of New York, seeking possession of the Debtor's premises, back rent, and other amounts.

## EVENTS LEADING TO THE CHAPTER 11 CASE

18. The Debtor's operations were primarily affected by the active and contentious litigation with one of its former designers. The breach of contract by this designer has substantially hurt the company's sales; and the legacy costs associated with the designer's operation could not be reduced quickly enough to offset this damage. While the Debtor has been successful at each step of such litigation, it has still taken a toll on the Debtor financially and caused the Debtor's principals to have spent significant time and effort focusing on issues outside of the operation of the Debtor's business.

19. Compounding the difficulties experienced by the Debtor from these operational issues and by the problems associated with operating in New York City, the Debtor has been hit hard by the general downturn in the wedding gown retail business due to the COVID-19 pandemic. Since early 2020, orders of the Debtor's merchandise has dropped significantly due to safety concerns as well as government responses and restrictions imposed in response thereto. Additionally, the pandemic, as well as the global supply chain issues have caused delays in filling orders. While the Debtor has taken steps to reduce its expenses, it has not been able to regain solvency.

20. The Debtor attempted to solicit interest from investors who would invest in the Debtor. Despite our best efforts over a period of multiple years, we have not yet found a willing investor in part due to the ongoing aforementioned litigation.

21. To allow the Debtor to continue operating, the Debtor instituted a reduction in staff and operations and now believes that it will be able to operate for the foreseeable future without

the immediate need for additional financing.  Additionally, the Debtor plans to sell certain assets that are not integral to its future operations.

22. It is the Debtor's hope that it can use the protections afforded by the Bankruptcy Code to allow it a breathing spell so that it can negotiate a plan of reorganization with its creditor body as a whole.

## FACTS RELEVANT TO FIRST DAY MOTIONS[1]

23. Together with the filing of this chapter 11 case, the Debtor filed certain First Day Motions, which request various types of relief.  Generally, the First Day Motions have been designed to meet the Debtor's goals of: (a) continuing its operations as debtor in possession with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of the greater community, its customers, employees, contractors, vendors, suppliers, and service providers during the Debtor's bankruptcy process; and (c) establishing procedures for the smooth and efficient administration of this case.

24. I have reviewed each of the First Day Motions filed contemporaneously herewith (including the exhibits thereto and supporting memoranda) and, to the best of my knowledge, information and belief, the facts recited therein are true and correct and are hereby incorporated by reference.  It is my belief that the relief sought in each of the First Day Motions is essential to the Debtor's ability to achieve a successful reorganization.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Motions.

A. **Motion of the Debtor Pursuant to Sections 361, 363(c) and 363(e) of the Bankruptcy Code, Rules 4001(b) and (d) of the Bankruptcy Rules and Local Rule 4001-2 for: (A) Entry of Interim Order (i) Approving Interim Use of Cash Collateral, (ii) Providing for Adequate Protection, (iii) Scheduling Final Hearing on Use of Cash Collateral, and (iv) Approving Form and Manner of Notice of the Final Hearing; and (B) Entry of Final Order Approving Use of Cash Collateral and Providing Adequate Protection (the "<u>Cash Collateral Motion</u>")**

25. Pursuant to the Cash Collateral Motion, the Debtor requests that the Court authorize, on an interim and final basis, the Debtor's use of Cash Collateral pursuant to the terms and conditions of the Interim Order. The Debtor further seeks an order deeming its pre-petition secured lender adequately protected for the Debtor's use of Cash Collateral due to the fact that such lender is fully over-secured in the Property and other assets of the Debtor, the Debtor proposes granting replacement liens in its assets as they are replenished, and the Debtor proposes making payments to the lender, to the extent practicable and permitted by the Court.

26. On information and belief, the Debtor's pre-petition secured lenders have asserted liens on the Debtor's cash. The Debtor seeks authorization to use Cash Collateral to fund the payment of all operating expenses incurred on and after the Petition Date, in accordance with the Cash Collateral Budget.

27. The Debtor's need to use Cash Collateral during the course of this case is most compelling. The failure of the Debtor to obtain immediate use of cash collateral would have a materially adverse effect on the Debtor's estate and creditors. Without the immediate use of cash collateral, the Debtor will be unable to pay the expenses associated with operating its business, including paying vendors and employees, or fund this bankruptcy case. Thus, Debtor's business operations and assets will be severely disrupted; importantly, the lender's collateral could be severely diminished absent lack of security and maintenance.

28. I believe the relief requested in the Cash Collateral Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest in this case.

    **B.**     **Debtor's Motion for Entry of Interim and Final Orders, Pursuant to Bankruptcy Code Sections 105(a). 345(b). 363(c)(1), 364(a), 364(a), and 503(a)(1), Bankruptcy Rules 6003 and 6004 And Local Rule 2015-2(A), Authorizing Debtor to Use Existing Cash Management System, (B) Authorizing and Directing Banks and Financial Institutions to Honor and Process Checks and Transfers, (C) Waiving Requirements of Section 345(b) Of Bankruptcy Code and (D) Authorizing Debtor to Use Existing Bank Accounts and Existing Business Forms (the "Cash Management Motion")**

29. Pursuant to the Cash Management Motion, the Debtor seeks entry of interim and final orders authorizing: (a) the Debtor to continue using its existing cash management system; (b) banks and financial institutions to honor and process checks and transfers; and (c) the Debtor to use its existing bank accounts and existing business forms.

30. In the ordinary course of business, the Debtor maintains an integrated cash management system that provides well-established mechanisms for the collection, concentration, and disbursement of funds used in its operations (the "Cash Management System"). The Cash Management System, composed of bank accounts at Wells Fargo Bank, Sterling National Bank and Bank of America, is used to receive incoming customer payments, deposit checks, concentrate funds and make disbursements in the ordinary course of the Debtor's business.

31. The Debtor is also party to separate credit card processing agreements (the "Processing Agreements") with Authorize.net, a subsidiary of Visa (the "Credit Card Processor"). The Credit Card Processor may argue that when a customer disputes a transaction with Debtor that has been paid for by an applicable credit card, the Credit Card Processor has an automatic right to debit the cash collections and disbursements account for the amount in dispute (a "Payment Chargeback"). The Debtor requests that the Credit Card Processor file a motion to lift the

automatic stay before proceeding to debit any of the Debtor's Bank Accounts on account of a disputed prepetition transaction.

32. I believe that the continuation of the Cash Management System, including with regard to the continued maintenance and use of the current Bank Accounts, payment of Bank fees, and maintenance of existing Business Forms, is vital to the Debtor's ability to operate effectively in chapter 11. Accordingly, I believe the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest in this case.

    **C.**    **Debtor's Motion Pursuant to Bankruptcy Code Sections 105(a), 363(b), 503(b), 507(a)(4), and 507(a)(8) and Bankruptcy Rules 6003 and 6004, for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Pay Certain Employee Compensation and Benefits, and (B) Maintain Such Employee Benefits Programs; and (II) Authorizing and Directing Banks and Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations (the "<u>Wages and Benefits Motion</u>")**

33. Pursuant to the Wage and Benefit Motion, the Debtor seeks entry of interim and final orders (i) authorizing, but not requiring, the Debtor to pay, in its sole discretion, certain obligations incurred prepetition, including (a) employee wages, salary and related obligations, (b) reimbursable business expenses, (c) employee medical expenses, (d) certain administrative plan payments, and (e) other prepetition employee-related obligations (collectively, the "<u>Employee Obligations</u>"); (ii) authorizing, but not requiring, the Debtor to maintain and continue to honor its employee-related practices, programs and policies as are set forth in further detail in the Wage and Benefit Motion (collectively, the "<u>Employee Benefit Programs</u>"); and (iii) authorizing and directing the Debtor's banks to receive, process, honor and pay all checks presented for payment or electronic payment requests from the Debtor's accounts, and granting authority to the Debtor to reissue any dishonored checks, relating to the Employee Obligations.

34. As of the Petition Date, the Debtor employs a total of 21 employees, all of whom work in the United States. I believe it is imperative that employee morale be maintained and that the Debtor have the authority to ensure that its employees do not unduly suffer as a consequence of the commencement of this chapter 11 case. Indeed, in the absence of granting the relief requested in the Wage and Benefit Motion, I believe the employees will suffer undue economic hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable certain of the employees to meet their own personal financial obligations.

35. Without the relief in the Wage and Benefit Motion, I believe the stability of the Debtor will be irreparably undermined by the distinct possibility that otherwise loyal employees will seek other employment alternatives. In addition, it would be inequitable to require the Debtor's employees to bear personally the cost of any Business Expense Obligation they incurred prepetition, for the benefit of the Debtor, with the understanding that they would be reimbursed.

36. Accordingly, I believe the relief requested in the Wage and Benefit Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest in this case.

**D. Debtor's Motion for Entry of Order (I) Authorizing Debtor to (A) Continue Their Workers Compensation Program and Insurance Programs, (B) Pay All Obligations in Respect Thereof, and (II) Authorizing and Directing Banks and Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations (the "<u>Insurance Motion</u>")**

37. Pursuant to the Insurance Motion, the Debtor seeks entry of an order authorizing the Debtor to (i) continue, in its sole discretion, its workers' compensation program (the "<u>Workers Compensation Program</u>") and its insurance policies and programs (collectively, the "<u>Insurance Programs</u>") that were in effect on or prior to the Petition Date; (ii) pay, in its sole discretion, all undisputed prepetition obligations for the Insurance Programs, including premiums, retrospective

adjustments, administrative and broker's fees, deductibles, and other fees and costs related thereto (collectively, the "Insurance Obligations").

38. The continuation of the Debtor's Insurance Programs on an uninterrupted basis is integral to the functioning of the Debtor's business. If any of the Insurance Programs are permitted to lapse, the Debtor could face significant liability for personal or property damage, which, in turn, could harm all parties in interest. The Debtor could also be forced to obtain replacement insurance coverage on an emergency basis and at significant cost, or one or more of the insurance carriers could decline to renew their insurance policies or refuse to enter into new insurance agreements with the Debtor in the future. Accordingly, the Debtor must make all payments with respect to the Insurance Programs, including, without limitation, any and all Insurance Obligations.

39. Accordingly, I believe the relief requested in the Insurance Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest in this case.

**E. Debtor's Motion for Entry of Interim and Final Orders Authorizing Debtor to Pay Taxes and Fees (the "Tax Motion")**

40. Pursuant to the Tax Motion, the Debtor seeks entry of interim and final orders authorizing, but not directing, the payment of Taxes and Fees in the ordinary course of business, without regard to whether such obligations accrued or arose before or after the Petition Date. In the ordinary course of business, the Debtor: (a) incurs and/or collect taxes, including sales, franchise, income, unemployment and other taxes in the operation of its business (collectively, the "Taxes"); (b) incurs regulatory, permit, inspection, and other similar fees and assessments (collectively, the "Fees") in connection with obtaining licenses and permits necessary to operate its business; and (c) remits such Taxes and Fees to various taxing, licensing, and other governmental authorities (collectively, the "Authorities").

41.     Many of the Taxes and Fees collected prepetition are not property of the Debtor's estate but, rather, are held in trust for the Authorities. The Debtor also seeks to pay certain Taxes and Fees to, among other things, forestall Authorities from taking actions that may interfere with the Debtor's administration of its chapter 11 case.  Such interference could include asserting liens on the Debtor's property or assessing penalties or significant interest on past-due taxes.  In addition, I understand that non-payment of the Taxes and Fees may give rise to priority claims pursuant to section 507(a)(8) of the Bankruptcy Code.

42.     Accordingly, I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest, and will enable the Debtor to continue to operate its business.

### F.     Motion for Order Authorizing the Payment of Certain Critical Vendors in Exchange for Continuing Relationship Pursuant to Customary Terms Conclusion (the "<u>Critical Vendor Motion</u>")

43.     The Critical Vendor Motion seeks authorization to pay all, a portion or none of the Critical Vendor Claims as determined by the Debtor in its sole discretion in order to continue the vital services provided by the Critical Vendors. The Debtor proposes to condition the payment of Critical Vendor Claims on the agreement of individual Critical Vendors to continue supplying goods and services to the Debtor on such customary terms (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, and other applicable terms and programs) that were most favorable to Debtor and in effect between the Critical Vendors and Debtor on an historical basis within one-hundred twenty (120) days of the Petition Date (the "Customary Terms"). The Debtor reserves the right to negotiate new terms with any Critical Vendor as a condition to payment of any Critical Vendor Claim.

44. The Debtor relies on certain vendors to support its core business functions by way of administrative and ancillary support, such as such as seamstresses, material suppliers, shippers, and carriers (collectively, the "Critical Vendors"). The Debtor estimates that, as of the Petition Date, it owes the Critical Vendors approximately $562,547.34 (the "Critical Vendor Claims").

45. The relief requested in the Critical Vendor Motion is critical to support the Debtor's operations. As a result of the Debtor's recent liquidity crisis, an increasing amount of the Debtor's Critical Vendors have demanded immediate payment in order to continue providing services or have required more stringent credit terms. The Debtor will not be able to operate if all Critical Vendors demand unreasonable terms. The relief requested in this Motion is therefore critical to enable the Debtor to continue existing relationships with Critical Vendors on customary and historical terms that will enable the Debtor to function throughout the pendency of its chapter 11 case.

46. Accordingly, I believe that the relief requested in the Critical Vendor Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest, and will enable the Debtor to continue to operate its business.

G. **Debtor's Motion for an Order Authorizing the Retention and Payment of Professionals Utilized in the Ordinary Course of Business (the "<u>Ordinary Course Professionals Motion</u>")**

47. In the ordinary course of its business, the Debtor employs certain legal and other professionals (the "<u>Ordinary Course Professionals</u>") to render litigation services and advice with respect to its business operations. Prior to the Petition Date, the Ordinary Course Professionals worked with the Debtor regarding such matters. Without the services provided by the Ordinary Course Professionals, the Debtor will not be able to continue to operate its business and properties.

48. By this Ordinary Course Professionals Motion, the Debtor seeks the authority to continue the retention of its Ordinary Course Professionals without the necessity of a formal retention application approved by the Court, and to compensate the Ordinary Course Professionals for services rendered, subject to certain limitations, without the necessity of Court approval. In addition, the Debtor requests authorization to supplement the list of Ordinary Course Professionals from time to time, as necessary.

49. Accordingly, I believe that the relief requested in the Ordinary Course Professionals Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest, and will enable the Debtor to continue to operate its business.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. Accordingly, I respectfully request that the Court grant all relief requested in the First Day Motions and such other and further relief as may be just.

Dated: October 2, 2023

On behalf of the Debtor,

By: */s/ Joseph L. Murphy*
Joseph L. Murphy
President and CEO